## JONES et al. v. UNITED STATES.

District Court, E. D. Virginia. July 16, 1927.

**1. Collision ⬤⟿136—What other repairs were made with repairs of collision damage held not to deprive owner of right to demurrage.**

Owner of dredge damaged in collision *held* entitled to recover demurrage for the time necessary to repair the damage, though other repairs were made at the same time, where they were not necessary at that time and did not delay the collision repairs.

**2. Collision ⬤⟿136—Damages for injury to working dredge held to include payment for loss of time of its entire plant.**

A dredge, injured in collision and laid up for a month for repairs, *held* entitled to recover, as an element of damages for time lost, not only by the dredge itself, but by its entire plant of attending tugboat, scows, etc.; no other dredge being available to keep the work going.

In Admiralty. Suit by Fred E. Jones and Robert Rogers against the United States. On Exceptions to Commissioner's report as to damages for collision. Modified and confirmed.

Baird, White & Lanning, of Norfolk, Va., for libelants.

H. H. Rumble, of Norfolk, Va., for the United States.

GRONER, District Judge. I have carefully considered the well-prepared and thoughtful report of the commissioner on the question of damages. The exceptions filed on behalf of the United States involve four questions, as follows:

First. Whether any demurrage should be allowed at all; the ground of objection to the allowance of such demurrage being that, while the dredge was laid up for the repairs made necessary by the collision with the steamer Hinckley, belonging to the United States, the owners took advantage of the opportunity to make certain repairs on their own account.

Second. Whether the entire delay caused in making the repairs should be allowed; the objection to this being that there was unnecessary delay in doing the work.

Third. Whether the demurrage should be based upon the loss of profits or earnings of the entire fleet used in the work under contract at the time of the collision, or should be confined to the loss of time sustained by the dredge alone.

Fourth. And, finally, the method of computing and ascertaining what the damages due to demurrage are.

[1] It will be seen from the above that there is no serious contention as to the amount of the repair bill. The commissioner reports, as to the first point, that the work done for the owner's account should not be considered as defeating or reducing libelants' claim for damages on account of demurrage, and he bases his conclusion in this respect upon his finding—in which I fully concur—first, that the work done for the owner's account did not delay the repair work caused by the collision; and, secondly, that the work done for the owner's account was not then necessary, but could have been done as conveniently a year later as at the time it was done. This precise question appears never to have been decided in any reported American case; the case of The Sequoia (D. C.) 132 F. 625, being, in many respects, different from the instant case, in that there the steamer Cleveland, damaged by a collision with the Sequoia, was at the time of the damage moored alongside a wharf undergoing necessary repairs to her boilers and machinery, and the work of repairs made necessary by the collision did not contribute to her detention in any material respect.

The English cases referred to in the commissioner's report show by an unbroken line that, where the repairs made by the owners are not obligatory, but a mere matter of convenience and result in no further detention, no account of them is taken in ascertaining the damages arising from demurrage caused by wrongful act on the part of another. It will accomplish no good purpose to quote at any length from these authorities, since they are all contained in the commissioner's report.

I am also in accord with the report of the commissioner that there was no unnecessary delay in making the repairs. It is true there was actual delay in taking down the bucket of the dredge, which was injured in the collision, and in replacing the shells for the same. The excuse for this is that it could not be lowered without the use of a crane, which was not than available, until the dredge was back in the water and steam gotten up, or a floating derrick brought alongside for the purpose of taking the bucket down. The latter plan seems to have been adopted. It occurs to me that it was possible, perhaps, to have anticipated this condition and to have provided against it, at least to the extent of having the new blades or shells made for the bucket in anticipation of their replacement when the dredge was put overboard again; but this would have imposed upon libelants, perhaps, a degree of foresight that was not obligatory under the circumstances.

At any rate, I have decided that, taking

the evidence as a whole, it is not unreasonable to say that the work of repairs made necessary by the collision, including the work on the bucket, was done with reasonable expedition. The season of the year was bad for work of this kind, and the difficulties of overtime work, if it had been practicable, would have about evened up in additional cost any advantages which might have accrued out of it. Hence I hold, in connection with the two points already mentioned, that there was an actual delay of 29½ days. This is one day less than the commissioner reports; but, since he includes the day of the accident, namely, the 30th of November, I think this deduction should be made. The collision occurred at 5 in the afternoon, while the dredge was idle and without any of her equipment at hand. Without her scows she was helpless to do any work. The lateness of the afternoon and the absence of this equipment would justify me, I think, in assuming that there was no loss on account of that day. This would leave the 31 days of December and the 7 days of January, which the commissioner allows, less the 8½ lay days, including Sundays and holidays, and the deduction of 1½ days on account of bad weather.

[2] As to point 3, mentioned above, the commissioner does not advert especially to this subject in his report. I am of opinion, however, that the loss to libelants of the use of the dredge carried with it the loss of the use of the attending tugboat, six mud scows, one coal scow, and the gasboat. They were all a part of a single plant. It might have been possible to have hired the scows out while the repair work was being done, but I think this not only unlikely, but the custom of the business and the danger of the loss of the scows or damage to them would, it seems to me, have made this imprudent. If the repairs were extended over a period of several months, a different conclusion might be proper.

Where, as in this case, the repairs occupied just a little over a month, including the holiday season, it would be going, I think, entirely too far to say that there was an obligation on the part of the dredge owner to turn this equipment over to some competitor in business, in the expectation of its return in good order when the dredge should be ready to return to work. The evidence tends to show that another dredge, to take the place of the one laid up, was not obtainable, and there is no evidence to the contrary. Under the circumstances, and particularly considering the comparatively short time that the repairs were estimated to require, it seems to

me fair to say that there was an actual loss to libelants of the entire outfit for the period mentioned, and that this loss could not have been lessened, in the exercise of ordinary care, either by obtaining a new dredge or in leasing out any part of the equipment.

This brings me to the last question, namely, the method of computing the damages for the delay. The commissioner reports that at the time of the collision the dredge was at work in New York harbor on a government contract, and had been for five or six months; that during that period the gross amount received by her owners was $327,964.57, which, divided on a per diem basis, after deducting lay days, amounted to $1,525.42 per day. He has deducted from the latter amount the sum of $123 per day as the average saving of the plant while laid up, and has in this way ascertained the amount which the dredge could have earned, except for the collision, for the days during which the repairs were under way as $1,402.42 per day; and, on the basis of 30½ days, has reported in favor of libelants on this account the sum of $42,773.81.

The commissioner reports further, in this same connection, that after the completion of the contract on which the dredge was engaged at the time of the collision the same outfit did certain work for the city of New York, from which it appeared that in one contract of 7 days the gross earnings of the dredge and fleet were $1,312.40 per day; that in a second contract, of 3 working days, the gross earnings were $1,440.37 per day; that in still another, of 9 days, the gross earnings per day were $1,635.75; and that still in another, of 4 days, the gross per day were $1,405.08. He also reports that the testimony of various witnesses for libelants was taken, and these witnesses placed the value of the plant at from $1,600 to $3,000 per day.

It should not be forgotten, in considering this subject, that after the repairs made necessary by the collision the dredge and her outfit returned to the contract and completed the same, so that there was actually no loss sustained to libelants by virtue of losing the profits from the contract, nor is there anywhere in the testimony any evidence of any actual loss sustained to libelants by reason of the delay, except such as by inference may be said to result necessarily from the lost use of the plant. If the contract had been lost, the measure of damages would, of course, have been the profits which would, except for the loss of the contract, have accrued to the owners.

But a somewhat different situation arises where, as in this case, there was no such loss,

but only the somewhat speculative loss dependent upon the continuous employment of the dredge and outfit thereafter. The New York contracts, which, altogether, occupied about a month, followed the completion of the government contract, upon which the property was engaged at the time of the damage. There is no evidence that these contracts were taken at any smaller figure than would have obtained if the dredge had been available for the work 30 days sooner; nor is there any evidence of what happened after the conclusion of the New York contracts—the state of the market for contract work of this character, either as to the opportunity of employment or the amount of the reward.

Under these circumstances, a somewhat different basis, it seems to me, should be adopted in determining the delay damages. The evidence on behalf of libelants is that the entire outfit was worth approximately $500,000. That this is full value—very full value—I have no reason to doubt; and yet to estimate the profits of such an outfit at $1,400 a day for 300 working days in the year, less the wages and keep of a lay-up crew, which by the widest stretch of imagination could not have exceeded $40,000, would realize a figure in profits of approximately $375,000, or about 75 per cent. of the total cost of the entire outfit.

That this is not just nor fair it is, of course, unnecessary to point out. What is, under the circumstances, fair, is a question not without difficulty, but in my judgment the mistake, if I may so characterize it, of the commissioner, lay in accepting the testimony of libelants of the saving during the period that the outfit was idle. This amount they placed at $123 per day. The evidence upon the subject is thoroughly unsatisfactory, and the scarcity and lack of detail of the cost of operation, running and idle, and an unwillingness to produce their books, accounts, and records when called upon, shows a lack of candor and frankness in this respect, which not only does not commend itself to me, but irresistibly points to the reason thereof. It is true they say that skilled men were difficult to obtain, and it was therefore, with the exception of a few deckhands and oilers, necessary that they keep their entire crew—35 men on the dredge, 6 on the scows, and 8 or 10 on the tug—employed, on full pay, during this entire period; but the actual proof of this is as unsatisfactory as the reason. If it is true, it was an act of gross negligence on their part, subversive entirely of the principle, imposed upon them by law, of reducing the damages as far as possible.

It is within the knowledge of the court that, with the exception of the engineers, masters, and mates, the crew of an ordinary dredge is not composed of skilled men. Undoubtedly they must be seamen, accustomed to work around the water and on boats, handling lines, and to work of that character generally; but they are no more skilled than the ordinary seamen or firemen on any coastwise or ocean-going vessel, and, in the exercise of ordinary care and prudence, could have been discharged and replaced without difficulty.

Again, it is apparent that, in figuring the saving by reason of the lay-up, nothing is allowed for saving in depreciation or for a like saving in wear and tear on machinery, rope, and other equipment of the dredge and scows, or anything of this character. Taking all these things into consideration, and in a spirit of liberality, lest I err against libelants' proper and legitimate claims, I have decided that the sum of $800 is an ample per diem charge for the time lost. If the difference between this amount and the cost to them of maintaining the plant while laid up does not show a fair profit, it is wholly due to their own negligence, and is their own fault; but I have no anxiety on this subject. It is true, no scientific formula is adopted in figuring this. None is, under the circumstances, possible; for, as has been, I think, sufficiently pointed out, the precise, exact amount of loss is at best susceptible of estimation, and in making such estimate, if I allow a crew of 25 men as necessary during the repair period at an average wage of $100 per month, the cost of maintaining them at $40 per man per month, the cost of coal (for steam for fire protection only) and wharfage at $1,500 per month, and the annual profits, including depreciation, overhead, etc., at 25 per cent. of the total investment, it would make a gross figure of approximately $15,000 for the 30 days, or $500 per day. The difference between this and the amount allowed will, I think, amply provide for any omissions I may have made.

The commissioner's report will therefore be confirmed, except in the respects mentioned, and also in respect to the allowance made by him of 3 days for the use of a tug in standing by the dredge after the collision, which is disallowed as to two days and allowed for one day, for reasons which, it seems to me, are obvious, and a decree will be entered, upon presentation, in accordance with these conclusions.